**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NELSON GONZALEZ,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 23-cv-14281 |
| **REYNALDO GUEVARA, WILLIAM** ) | |
| **JOHNSTON, EUGENE VANN, ROLAND** ) | |
| **PAULNITSKY, GERI LYNN YANOW** ) | Hon. LaShonda A. Hunt |
| **as SPECIAL REPRESENTATIVE for** ) | |
| **ERNEST HALVORSEN, UNKNOWN** ) | |
| **CHICAGO POLICE OFFICERS OF THE** ) | |
| **CHICAGO POLICE DEPARTMENT** ) | |
| **and the CITY OF CHICAGO,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

## AMENDED COMPLAINT

Plaintiff, NELSON GONZALEZ, by his undersigned attorney, for his complaint against former Police Detectives, REYNALDO GUEVARA, WILLIAM JOHNSTON, EUGENE VANN, ROLAND PAULNITSKY, GERI LYNN YANOW as SPECIAL REPRESENTATIVE for ERNEST HALVORSEN, deceased, UNKNOWN CHICAGO POLICE OFFICERS, and the CITY OF CHICAGO.

## INTRODUCTION

1. Plaintiff, Nelson Gonzalez, spent 23 years incarcerated in the Illinois Department of Corrections for the murder of Jose Mendoza – a crime he did not commit.

2. He served his entire 45-year sentence before being exonerated.

3.      In and around July 12, 1993, the Police Officer Defendants conspired among themselves and with others, known and unknown, to frame Plaintiff for the murder of Jose Mendoza ("Mendoza").

4.      Plaintiff's arrest, indictment, prosecution, and conviction were based entirely on false evidence that Defendants manufactured against him.

5.      All of the Defendants concealed the fact that they conspired to and did frame Plaintiff for Mendoza's murder. Notorious Chicago police detective, Defendant Guevara, targeted Plaintiff for the Mendoza murder even after the only witnesses to the crime repeatedly told detectives that they could not identify the perpetrators and were too drunk to even remember the event.

6.      The Defendant Officers manipulated a false identification from the victim's brother, Ciro Mendoza by assuring him that Plaintiff was the offender, by showing him a photo of Plaintiff before having him view a lineup that included Plaintiff, and by telling him that Plaintiff lived at the location of the beating and that streets were saying Plaintiff committed the crime.

7.      At no point did the Defendants disclose to the criminal defense lawyers or the prosecution that Defendant Guevara fabricated an "anonymous tip" to justify conducting a rigged line up or that the Defendants manipulated and pressured Ciro's identification.

8.      The Defendant Officers further concealed *Brady* material that would have demonstrated Plaintiff's innocence at trial. They concealed that Defendant Guevara disclosed his intent to frame Plaintiff for the Mendoza murder after the witnesses could not provide even a minimal description of the offender, Guevara's intention to fabricate an "anonymous tip," or his conduct in influencing the false identification by Ciro. The Defendant Officers knew that

Guevara and other investigators threatened and coerced the other witnesses, including by threatening deportation if they did not adopt the Defendant Officers' false narrative.

9.      Plaintiff is one of over 40 men and women who have been exonerated after being convicted of murder charges arising from corrupt homicide investigations conducted by Area Five detectives, including Defendants Guevara and Halvorsen.

10.     Indeed, the Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

11.     Both Defendants Guevara and Halvorsen have invoked their Fifth Amendment rights not to incriminate themselves in response to questions about whether they framed Plaintiff and concealed exculpatory material that led to his wrongful conviction.

12.     After the commencement of a post-conviction evidentiary hearing in the Circuit Court of Cook County, the Cook County State's Attorney agreed that Plaintiff's conviction should be vacated on actual innocence grounds.

13.     On August 9, 2022, Cook County State's Attorney Kim Foxx publicly declared that she could not stand by the conviction of Plaintiff and seven other individuals. The State appeared before the Honorable Judge Diana Kenworthy on that day and dismissed the charges against Plaintiff.

14.     Judge Kenworthy, who had heard Plaintiffs' testimony, told Plaintiff that he had every right to be bitter but that she hoped he was not so he could enjoy the rest of his life. She then apologized to Plaintiff on behalf of the Court.

15.     On March 13, 2023, Plaintiff received a certificate of innocence.

16.     Plaintiff served nearly 23 years in the department of corrections for crimes that he did not commit, ripped from his family and his children.

17.    Plaintiff now seeks justice for the inconceivable harm that the Defendants caused him and redress for the incalculable loss of liberty and hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

18.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

19.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

20.    Plaintiff Nelson Gonzalez is a 54-year-old Latino man who spent 23 years in prison for a crime he did not commit.

21.    At all relevant times hereto, Defendants Reynaldo Guevara (Star No. 20861), Roland Paulnitsky (Star No. 20709), Ernest Halvorsen (Star No. 20692), William Johnston (Star No. 20696) and Eugene Vann (Star No. 20788) was a member of the Chicago Police Department. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, coerce fabricated statements, and maliciously prosecute Plaintiff for the murder of Jose Mendoza.

22.    Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

23.      Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

24.      Each of the individual Chicago Police officer defendants are sued in his individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

**A.      The Beating Death of Jose Mendoza**

25.      On the afternoon of June 19, 1993, Jose Mendoza ("Mendoza"), Raul Moreno ("Moreno"), Ciro Mendoza ("Ciro") and Romaldo Alvarez ("Alvarez") spent the better part of the day drinking beers at Mendoza's home located at 2015 Kilborn in Chicago.

26.      At approximately 11:30 p.m. the four men got into Mendoza's car and drove to a bar at California and Milwaukee avenues in Chicago where they continued to drink for the next two hours.

27.      At approximately 2:00 a.m., the four men left the bar. Mendoza was driving the car, Alvarez sat next to him in the front passenger seat, Moreno sat in the backseat behind the driver, and Ciro sat in the backseat on the passenger side.

28.      At the intersection of Cortland and Kostner, Mendoza's car stalled. While Mendoza attempted to restart the car, five or six young men who were in a red car parked near the intersection approached Mendoza's car. Someone broke out the back window with a baseball bat, and another attacker shattered the front window by the driver's side.

29.      One of the attackers hit Mendoza twice in the head with a baseball bat as he was seated in the driver's seat. The occupants of the car were highly intoxicated.

30.      As Mendoza was being attacked, Ciro who was seated in the back reached into

the front seat and grabbed his brother's assailant. He tried to tell the attacker to leave them alone and grabbed his hand, pulling the attacker's arm into the car and pulling off the attacker's wristwatch.

31.     After the attackers fled to a red car, Moreno moved into the driver's seat while Ciro jumped into the front of the car with his wounded brother, and the men sped off in search of a hospital.

32.     Chicago police officers Sierra and Soria, who were investigating an unrelated hit-and-run accident at Kimball and Armitage observed Mendoza's car driving erratically on Armitage and began following the car.

33.     After the car ran a red light, the officers attempted to stop the car. After approximately three blocks, the car stopped.

34.     When the officers approached the car, they observed Mendoza covered in blood laying on his side in the front passenger seat supported by Ciro.

35.     The officers placed Moreno in their squad car and radioed for an ambulance. An ambulance arrived and transported Mendoza to the hospital. Ciro followed the ambulance to the hospital in Mendoza's car and then took Moreno home.

36.     No police officers or detectives went to the police station and none of the occupants of the car were interviewed in connection with the incident.

37.     No investigation was commenced in connection with this incident until Mendoza died six days later on June 26, 1993. A toxicology report showed that Mendoza's Blood Alcohol Content was .38.

**B.     Initial Police Investigation**

6

38.     On June 26, 1993, the medical examiner's officer notified a sergeant at Area Five Violent Crimes that a man named Jose Mendoza died as a result of blunt force head trauma apparently from an assault. After it was determined that no prior incident reports had been made in connection with Mendoza's assault/homicide, detectives were assigned to commence an investigation into the death of Mendoza.

39.     Detectives Sanders and Cervantes tracked down Ciro Mendoza (the deceased's brother) and Alvarez who were interviewed at Area Five about the attack at Cortland and Kostner. Ciro described the attack and explained how he pulled the offender's wristwatch off his arm; he provided the wristwatch to the detectives to be inventoried. Ciro's only description of the offender was a male white, 16 to 18, with black hair. Ciro reviewed numerous mugshot books with negative results. Alvarez could not describe any of the offenders. He also viewed mugshot books with negative results.

40.     Plaintiff's mugshot was contained in this mugshot books and neither Ciro nor Alvarez identified him.

41.     Detectives conducted a canvass of the neighborhood around Cortland and Kostner with no leads. Indeed, no one in the neighborhood heard any commotion during the early morning hours of June 20, 1993. The investigation immediately went cold.

## C.     Guevara Targets Plaintiff for a Frame-Up

42.     With no leads on the Mendoza homicide, Defendant Guevara decided to frame someone for the murder as was his pattern and practice. Guevara was not even assigned to the Mendoza homicide, but Guevara routinely "closed" unsolved homicide investigations assigned to other detectives by framing Hispanic men. It didn't matter much to Guevara who he framed.

Defendant Guevara's colleagues at Area Five, including his supervisors, knew that Guevara fabricated evidence to close cases and they assisted him in doing so.

43.     Roughly two weeks after Mendoza's death, Plaintiff was standing outside his father's home located 1855 N. Kostner in Chicago. Plaintiff's home was near the intersection of Kostner and Cortland where the Mendoza beating occurred.

44.     Defendant Guevara approached Plaintiff and told him he was investigating an incident that had occurred late on the evening of July 19, 1993 which was the night of a Bulls playoff game. Plaintiff told Defendant Guevara that he did not know anything about the incident and that he was actually out of town the weekend of the Bulls playoff game.

45.     Defendant Guevara handed Plaintiff his card and asked Plaintiff to call him if he heard anything about an incident that occurred on June 19, 1993.

46.     About a week later on July 12, 1993, two detectives came to Plaintiff's home in the morning hours and asked him "to take ride with them to the 25th District." Plaintiff complied.

47.     Plaintiff was placed in an interview room at Grand and Central where he was questioned by Defendant Paulnitsky and another unknown detective regarding a shooting that occurred in and around June 30, 1993. Plaintiff had no involvement or knowledge about the shooting and told the detectives as much.

48.     Defendant Guevara, who was not assigned to the shooting investigation, told Defendant Paulnitsky that he wanted to question Plaintiff about the unsolved Mendoza murder and close the case by framing Plaintiff. Defendant Paulnitsky, who had framed Hispanic men with Defendant Guevara in the past, agreed to help his colleague Defendant Guevara frame Plaintiff for the murder.

49.     Defendant Paulnitsky brought Defendant Guevara into the interrogation room and continued to question Plaintiff about the shooting. Plaintiff maintained his innocence and the Defendants left the room. Defendant Guevara returned sometime later with Defendant Johnston. Defendants Guevara and Johnston began to interrogate Plaintiff about the Mendoza murder.

50.     When Defendant Guevara mentioned that the victim was a Mexican man who was beaten near Plaintiff's home on the evening of the Bulls playoff game, Plaintiff reminded Defendant Guevara that he had already questioned Plaintiff about this incident and that Plaintiff told Defendant Guevara he was out of town that weekend.

51.     Plaintiff explained that on June 19, 1993, he was in Lake Station, Indiana celebrating Father's Day weekend and that it was same weekend of the Bulls playoff game.

52.     Over the course of 24 hours, Defendants Guevara and Johnston continued to interrogate Plaintiff about the Mendoza murder. Plaintiff continued to deny involvement in the beating incident. The interrogation became increasingly hostile and aggressive with Defendant Guevara using foul language, accusing Plaintiff of lying, raising his voice and threatening Plaintiff.

53.     Plaintiff was denied food and water, was not allowed to use the restroom and was eventually forced to urinate in the corner of the interrogation room. Defendant Guevara grabbed Plaintiff by the back of the neck and continued to accuse Plaintiff of committing the murder.

54.     Plaintiff repeatedly told Defendants Guevara and Johnston that he had an alibi and identified individuals in his family who could confirm his alibi that he was with them in Lake Station, Indiana the weekend of the Bulls playoff game. The Defendants told Plaintiff they didn't care about his alibi and had no intentions of speaking to anyone who would confirm it.

55.     Despite a lengthy and grueling interrogation, Plaintiff's will was not broken and he did not provide an inculpatory statement.

**D.     Defendants Fabricate a Confidential Tip to Justify Conducting a Line-Up.**

56.     Unable to force Plaintiff to make a false inculpatory statement, Defendant Guevara fabricated an "anonymous tip" so that he could put Plaintiff in a line-up to be falsely identified by Ciro Mendoza.

57.     Defendant Guevara falsely alleged that an anonymous caller called him personally to tell him that Plaintiff was in custody in the 25th District for a shooting and that he [Plaintiff] was also involved in the baseball bat beating of a Mexican man in the area of Cortland and Kostner. The "anonymous tip" was fabricated from whole cloth. Defendant Johnston knew the tip was a lie and prepared a police report falsely claiming that Defendant Guevara received an "anonymous tip" implicating Plaintiff in the Mendoza murder.

58.     All Police Officer Defendants knew that there was no "anonymous tip" made to Area Five implicating the Plaintiff in the Mendoza murder and agreed to conceal that false and fabricated information from the criminal justice system.

59.     Defendants Guevara, Johnston, Halvorsen, and Vann arranged to have Ciro Mendoza and Raul Moreno come to the police station to view a line-up even though both men consistently stated that they did see the offenders.

60.     Defendant Guevara and Johnston falsely told Ciro Mendoza that they had their brother's killer in custody and they just needed him to identify him from a line-up. Defendants explained that their brother's killer would go free if he did not identify him. Defendants falsely told Ciro that they developed other evidence that unequivocally proved that Plaintiff was the person who beat Jose Mendoza to death.

61.     Defendants Guevara and Johnston compiled a four-person line-up. Defendant Guevara communicated with Ciro in Spanish and had him view the line-up telling him who to pick out from the line-up. Defendant Johnston remained in the room with the line-up participants. Ciro identified Plaintiff from the four-person line-up based on the influence and manipulation of Defendant Guevara.

62.     Defendant Guevara also attempted to influence Raul Moreno to identify Plaintiff but Moreno refused.

63.     None of the Defendant Officers ever disclosed to the criminal justice system that Defendant Guevara had told Ciro that Plaintiff was the perpetrator and had told him who to identify from the line-up.

64.     Defendant Johnston authored a cleared and closed report that contained a litany of false statements, including that Guevara received an "anonymous tip;" that Ciro Mendoza legitimately identified Plaintiff from the line-up, and that Plaintiff gave inconsistent statements about his alibi on the night of the beating. In truth, Plaintiff gave a consistent account of his alibi that Defendants ignored.

65.     Plaintiff was charged with first degree murder of Jose Mendoza on July 14, 1993 after 48 hours in custody at Area Five.

**E.     Plaintiff's Trial**

66.     The prosecution's case against Plaintiff hinged entirely on the testimony of Ciro Mendoza who falsely identified Plaintiff as the person responsible for beating his brother. Mendoza's identification was manipulated and fabricated by Defendant Guevara with the assistance of the other Defendant Officers.

67.     Defendant Guevara falsely testified at trial that Ciro Mendoza confidently

11

identified Plaintiff from a line-up but did not disclose that he manipulated and induced the false

identification by telling Ciro who to identify.

68.     No physical or forensic evidence connected Plaintiff to the crime.

69.     A jury returned a verdict of guilt against the Plaintiff for first degree murder on

November 10, 1994. On February 10, 1995, Mr. Gonzalez was sentenced to a term of 45 years in

prison.

**F.     Plaintiff's Exoneration**

70.     Throughout his wrongful incarceration, Plaintiff tirelessly fought to prove that he

was innocent and wrongfully convicted of the 1993 murder of Jose Mendoza.

71.     Plaintiff fought for DNA analysis of the watch wristband that Ciro Mendoza

claimed to pull off the arm of his brother's attacker. After a long and arduous fight, Plaintiff

eventually won DNA analysis of the watch wristband and the analysis excluded Plaintiff as the

source of the DNA on the wristband.

72.     Plaintiff was represented by Northwestern University Center on Wrongful

Convictions for many years, but when his assigned attorney left the office, he waited patiently

for another attorney to take up his cause. During this time, attorneys from Northwestern and

elsewhere developed significant evidence of a pattern and practice of misconduct by Defendant

Guevara.

73.     Plaintiff was paroled from prison on October 16, 2016. He served over 22 years in

the Illinois Department of Corrections.

74.     Plaintiff continued to pursue his innocence upon his release. Plaintiff, through

new counsel, filed a post-conviction petition raising his actual innocence based on a prodigious

pattern of misconduct by Guevara and the fact that both Defendants Guevara and Halvorsen

when questioned about their investigation into the Mendoza murder pled the Fifth Amendment in response to questions about whether they framed Plaintiff.

75.     An evidentiary hearing on Plaintiff's post-conviction claim of actual innocence commenced before the Honorable Judge Diana L. Kenworthy on March 29, 2022.

76.     Before the conclusion of the evidentiary hearing, the State agreed that Plaintiff's conviction should be vacated on actual innocence grounds. The State then dismissed all charges against Plaintiff on August 9, 2022.

77.     Plaintiff received a Certificate of Innocence on May 23, 2023.

**Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution**

78.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice on scores of criminal defendants like the one endured by the Plaintiff.

79.     Since the 1980s, no fewer than 100 cases have to come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

80.     These cases include many in which Chicago police officers used the same tactics that Defendants employ against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing statements through physical and psychological abuse, and manipulating witnesses in order to influence eyewitness identifications and testimony - all to secure the arrest, prosecutions, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

81.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

82.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

83.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

84.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

85.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

86.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C

14

4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

87.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

88.     Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

89.     Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

90.     For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of disgraced (and imprisoned) officer Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in the 1980s as gang crimes officers before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

91.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

92.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

93.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

94.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse

circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

95.     This belief extends to the Defendants in this case. By way of example, Defendants Halvorsen and Guevara have a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Halvorsen and Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

96.     The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.     The conduct of live lineup, photographic, and other identification procedures.

b.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.     The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.     The use of anonymous or confidential informants.

17

e. risks of wrongful conviction and the steps police officers should take to minimize risks.

f. The risks of engaging in tunnel vision during investigation.

g. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

97. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

98. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

99. The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

100. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

101. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara and Halvorsen Long History of Framing Innocent People**

102. Prior to becoming a detective in 1990, Defendant Guevara was assigned to Gang Crimes North where he worked as a Gang Crimes Specialist and assisted detectives at Area Five in framing innocent young Latino men for crimes they did not commit.

103. Just by way of example, in 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

104. Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson which he later recanted.

105. Juan Johnson was exonerated and brought a suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

106. As a gang crimes specialist in 1988, Defendant Guevara also caused a 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. Rivera was convicted of the Valentin murder. In 2011, Lopez admitted that he knew Rivera was the "wrong guy." Defendant Guevara also falsely claimed that victim identified Rivera before he died even though a doctor would later testify that the victim was in a medically induced coma and was not conscious at the time Guevara claimed he made the identification.

107.    Rivera was exonerated and brought a federal civil rights lawsuit against Defendant Guevara and others. A federal jury found that Guevara had violated Rivera's civil rights and awarded him $17 million in damages.

108.    Once becoming meritoriously promoted to detective, Defendants Guevara and Halvorsen worked as partners to continue their pattern and practice of framing innocent people for crimes they did not commit.

109.    As a result of the policies and practices of the Chicago Police Department, described above, Defendants Halvorsen and Guevara framed dozens of innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against the Defendants.

110.    As of the filing of this Complaint over 40 men and women have had their convictions thrown out because Defendant Halvorsen and/or Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jose Maysonet, Alfredo Gonzalez, Jorge Pacheco, Roberto Almodovar, William Negron, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, David Lugo, Carlos Andino, Daniel Rodriguez, Jamie Rios, Fabian Santiago, Jamie Rios, Jose Cruz, Marilyn Mulero, Reynaldo Munoz, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davilla, Gamalier Rivera, Madeline Mendoza, Tony Gonzalez, and Johnny Martinez. These men and women served hundreds of years for crimes they did not commit.

111.    As of the filing of this Complaint, Defendants Guevara and Halvorsen are being sued for framing Defendants in dozens of federal civil rights actions.

112.    Defendants Halvorsen and Guevara have a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, and suppressing exculpatory evidence, all in the course of maliciously prosecuting innocent persons.

113.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Halvorsen and Guevara and others, it is apparent that these Defendants engaged in such misconduct because they had every reason to believe that the City of Chicago and its Police Department condoned their behavior.

114.    For over a decade, Defendant Guevara has repeatedly invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Before Defendant Halvorsen died, he also invoked his Fifth Amendment right not to answer questions about allegations against him, including questions posed to him about his conduct in *this* case.

115.    The following chart reflects a summary of just some of the allegations lodged against Defendants Guevara and Halvorsen:

| WITNESS | SUBSTANCE OF SWORN TESTIMONY/AFFIDAVIT |
|---------|----------------------------------------|
| Armando Serrano | Armando Serrano spent twenty-three years incarcerated for the murder of Rodrigo Vargas, a crime he did not commit. Officers Halvorsen, Guevara and Mingey conspired with prosecutors to frame Serrano for Vargas' murder. Halvorsen and Guevara fabricated witness testimony from a notorious "snitch" witness, Francisco Vicente to secure the conviction of Serrano. Halvorsen and Guevara knew Vicente from the streets and cultivated him as a snitch witness to help frame Serrano. The officers also beat and coerced Timothy Rankins into testifying before the Grand Jury against Serrano. Serrano himself was interrogated by detectives Halvorsen and Guevara who used a good cop/bad cop approach in attempting to coerce a statement from him through physical and psychological abuse. On June 7, 2016, the Appellate Court opined |

| | |
|---|---|
| | "in many of the cases where an individual has accused Guevara of misconduct, Halvorsen is accused of participating or at least being involved in the case. He is not some disinterested witness, especially after the myriad allegations of misconduct have been brought to light." Halvorsen invoked his fifth amendment right, refusing to answer any questions regarding his investigation into the Vargas murder and the prosecution of Serrano. Specifically, when asked whether he framed Armando Serrano and his co-defendant Jose Montanez, Halvorsen pled the Fifth. Serrano was later exonerated and received a certificate of innocence. A federal civil rights action against Guevara and Halvorsen (and others) was settled for over $15 million. |
| Jose Montanez | Jose Montanez also received a certificate of innocence after being exonerated in 2016 for the murder of Rodrigo Vargas on February 5, 1993. In 2016, the appellate court found that "Montanez and his codefendant Serrano presented profoundly alarming acts of misconduct in the underlying investigation and prosecution that warrant closer scrutiny by appropriate authorities." The same evidence used to convict Serrano (as mentioned above) was used to implicate Montanez. Halvorsen invoked his fifth amendment right, refusing to answer any questions about his role in the investigation and prosecution of Montanez and Serrano. Montanez's civil rights action was also settled for over $15 million. |
| Roberto Almodovar | Roberto Almodovar received a certificate of innocence after spending twenty-three years in prison for the murders of Amy Merkes, Jorge Rodriguez and the attempted murders of Kennelly Saez and Jacqueline Grande. Halvorsen, Guevara and other officers conspired to frame Almodovar for these murders even though they knew he was innocent. Halvorsen and Guevara manipulated Grande into falsely identifying Almodovar by informing her, while she was still in the hospital suffering from a gunshot wound, that Almodovar was the person who shot her and murdered her friends and she should identify them in a line-up. Halvorsen falsified police reports alleging that Almodovar admitted that he was a gang member and induced a second witness, Kennelly Saez to identify Almodovar in a line-up. During his deposition, Halvorsen pled the fifth when asked if he framed Roberto Almodovar for the murders of Merkes, Rodriguez and the attempt murders of Saez and Grande. Almodovar was exonerated and received a certificate of innocence. He currently has a pending federal civil rights lawsuits against Halvorsen and Guevara. |
| William Negron | William Negron, the co-defendant of Roberto Almodovar was falsely implicated in the murders of Amy Merkes, Jorge Rodriguez and the attempted murders of Kennelly Saez and Jacqueline Grande as well. Halvorsen, Guevara and Mingey used the same evidence against Almodovar to implicate Negron – two false identifications. Halvorsen asserted his fifth amendment right when asked if he framed William |

| | |
|---|---|
| | Negron for the murders of Merkes, Rodriguez and the attempt murders of Saez and Grande. |
| Angel Rodriguez | In 2000, the murder conviction of Angel Rodriguez was reversed by the appellate court, which found that the testimony of the State's purported eyewitness, which was procured by Halvorsen, was not credible and directed that Rodriguez be released without retrial. In this case, Halvorsen threatened to charge the only witness, Andrew Bolton with conspiracy to commit murder if he didn't identify Rodriguez to close the case. Halvorsen also used improper and suggestive identification procedures by including Rodriguez in multiple photo arrays that he persistently and consistently showed Bolton to influence his identification. |
| Jose Maysonet Jr. | Jose Maysonet was framed for the murder of the Wiley brothers in and around August 22, 1990 by Halvorsen, Guevara, Mingey, Montilla Paulnitsky and ASA DiFranco. Specifically, Halvorsen authored a false and fabricated supplemental police report that served to justify Maysonet's unlawful arrest and bolster the bogus investigation conducted by his fellow officers. Halvorsen also gave false testimony before the grand jury. Halvorsen was asked during his deposition if he framed Jose Maysonet for the murders of Kevin and Torrence Wiley and if he fabricated statements to use against them. He asserted his fifth amendment right to both questions. Maysonet's convictions were vacated in November 2017. |
| Arthur DeLeon-Reyes | DeLeon-Reyes ("Reyes" ) was exonerated for the 1998 double murder of Mariano and Jacinto Soto and the abduction of their infant daughter. Reyes proclaims that Guevara, Halvorsen and other CPD officers slapped him repeatedly and tricked him into signing a confession in English even though Reyes spoke no English and thought he was signing release papers. Reyes was repeatedly struck and beaten while handcuffed by the officers and interrogated over a period of 40 hours. DeLeon-Reyes' convictions were vacated after an evidentiary hearing where the trial court judge concluded that detective Guevara was a liar. De-Leon Reyes received a COI. |
| Gabriel Solache | Solache, the co-defendant of Reyes, was also exonerated as a result of Halvorsen, Guevara and other CPD officers' misconduct. The officers coerced and fabricated false inculpatory evidence and hid exculpatory evidence from Solache resulting in almost twenty years of wrongful incarceration and over two years on death row.  Solache had been at the police station for more than forty hours, deprived of sleep food and access to the bathroom and was forced to sign a statement in English even though he did not speak, read or write in English. Guevara's beating of Solache was so severe that it caused permanent hearing loss. Solache received a COI |
| Thomas Sierra | Thomas Sierra was exonerated for the murder of Noel Andujar after spending twenty-two years in prison. CPD Detectives Halvorsen, Guevara and others manufactured false evidence against Sierra |

| | |
|---|---|
| | including two fabricated eyewitness identifications. When questioned about the Sierra matter at his deposition, Halvorsen pled the fifth when asked if he framed Thomas Sierra for the murder of Noel Andujar. He also pled the fifth when asked if he told eyewitnesses Albert Rodriguez and Jose Melendez who to pick out of the photo line-up and array. In addition, Halvorsen pled the fifth when asked if he had falsified police reports in the Sierra matter and committed perjury at Sierra's trial. |
| Eruby Abrego | Abrego contends that he is serving a 90-year prison sentence for a murder that he did not commit as a result of the misconduct of Officers Guevara, Halvorsen and Wojcik. Abrego alleges that Guevara and Halvorsen coerced one of the witnesses, Ramon Torres to identify Abrego as the shooter. Torres has since recanted his testimony and explained that the police told him Abrego was the shooter and he went along with what the police wanted him to say even though he knew Abrego was not the shooter. The police forced Torres to implicate Abrego in a line-up and testify against him. |
| Tony Gonzalez | Tony Gonzalez proclaims that he is wrongly incarcerated for first degree murder of Hector Rivera and attempt murders of Luis Marrero and Iluminada Nieves as a result of Halvorsen and Guevara's result. Halvorsen and Guevara improperly influenced Marrero and 15-year-old Spanish speaking witness, Yesenia Rodriguez to identify Gonzalez in-court. Halvorsen asserted his fifth amendment right when asked if he and Guevara used Yesenia Rodriguez to frame Tony Gonzalez for the murder of Rivera and attempts of Marrero and Nieves. |
| Francisco Vicente | Vicente was physically and psychologically coerced and threatened by Halvorsen and Guevara for the purpose of cultivating him as a "witness" in cold case murder investigations. Specifically, Vicente was used as a "jailhouse snitch" to implicate Armando Serrano, Jose Montanez, Jorge Pacheco, Geraldo Iglesias and Robert Bouto. In order to obtain Vicente's cooperation, Halvorsen played "good cop" to Guevara's "bad cop" and offered Vicente perks while incarcerated such as food and candy, knowing that Vicente was going through heroin withdrawals, lighter sentences for his voluminous criminal charges, private prison visits with his wife and money. Both Halvorsen and Guevara also beat Vicente when he didn't do as they said. During his deposition, Halvorsen was asked if he actually used physical and psychological coercion against Vicente to implicate Montanez, Serrano and Pacheco and he pled the fifth. Halvorsen also pled the fifth when asked if used Vicente to make up a false story to implicate Iglesias. |
| Robert Bouto | Bouto was wrongly convicted for the murder of Salvador Ruvalcaba. Halvorsen, Guevara and Mingey worked jointly to frame Bouto by fabricating police reports, withholding exculpatory and material evidence, coercing witnesses to implicate him, and conducting unlawfully suggestive line-ups. Specifically, Halvorsen and Guevara told Vicente they'd help him with his robbery charges if he assisted in framing Bouto for Ruvalcaba's murder. During his deposition, |

| | |
|---|---|
| | Halvorsen pled the fifth when asked about these specific allegations. Bouto received a certificate of innocence. |
| Carl Richmond, Frankie Escobar, and Rey Lozada | Guevara and Halvorsen directed Richmond, Escobar and Lozada to falsely identify Robert Bouto as the shooter of Salvador Ruvalcaba from a line-up. Prior to identifying Bouto in a line-up, Guevara and Halvorsen had the witnesses view Bouto in handcuffs. They threatened to frame Richmond for a murder if he did not make an identification. At his deposition, Halvorsen pled the fifth when he was asked if he improperly influenced the witnesses in the Ruvalcaba murder to choose Bouto out of the line-up. He pled the fifth when asked if he harassed Carl Richmond in an effort to get him to falsely implicate Bouto at trial. Halvorsen again pled the fifth when asked if he told Richmond he would place false charges on him if he did not implicate Bouto. |
| Antonio McDowell | McDowell alleges that he was framed by Guevara and Halvorsen using coercive tactics and improperly influencing witnesses to falsely identify him. |
| Alfredo Gonzalez | On August 22, 1990, Gonzalez was arrested for a double murder by Detectives Halvorsen and Guevara. He was taken to Area 5 and placed in an interrogation room. During his interrogation, Gonzalez was beaten, threatened and held incommunicado even after asking for his lawyer. Halvorsen told Gonzalez, "I know him [Guevara], He is never going to let you leave here until you admit you did this." Halvorsen also stomped on Gonzalez's foot breaking his big toe, and slapped him several times. Halvorsen further conspired with ASA DiFranco in order to secure fabricated statements from Gonzalez and Maysonet that would later be used against them to secure their wrongful conviction Halvorsen was asked during his deposition, "Isn't it true that you framed Alfredo Gonzalez for the murders of Kevin and Torrence Wiley that occurred on May 24, 1990?" Halvorsen pled the fifth. Gonzalez's convictions were vacated and all charges dismissed against him. |
| Justino Cruz and Christopher Goosens | Halvorsen conspired with Guevara, Paulnitsky, Mingey and Epplen to frame Cruz and Goosens for the murders of Kevin and Torrence Wiley on May 24, 1990. |
| George Laureano | George Laureano testified that around 1988-1989 Detectives Halvorsen and Gang Crimes Specialist Guevara attempted to frame him for a murder even though he was in custody at the time. He was never charged for that murder.<br><br>In late 1991, Halvorsen and Guevara tried again, and attempted to frame him and his co-defendant Daniel Rodriguez for the murder of Junito (Jose Hernandez). Laureano hired Richard Beuke as his attorney who promised to get him acquitted once he got his case transferred to Judge Reyna. Laureano was acquitted. Rodriguez was convicted and sentenced to 25 years. Rodriguez was later exonerated and received a COI. |

| | |
|---|---|
| | In winter of 1993, Laureano was at the Homicide Division at Area 5 with Halvorsen, Guevara and Joe Miedzianowski[1] because he was the only witness to a murder on Keystone and Cortland. While at the police station, the officers said, "Bro, we need a favor. We don't like this asshole, and we just need you to say it was him. He is a jag off, we don't like him, and we want to put this case on him." They were referring to a guy named Chino. Laureano refused to frame an innocent man and showed the officers an obituary for the guy who actually committed the murder. Halvorsen replied, "You are going to put it on a dead man, right?" Laureano said yes, he is the one who did it," and the officers said okay and closed the case.<br><br>Laureano was approached again in the late 90s about a murder of Daniel Matias ("Snoopy") that occurred on Keystone and Bloomingdale by Halvorsen and Guevara. The officers asked Laureano if he knew a girl named Jessica Rivera because she was a witness to that murder. They wanted Laureano to help them pin a murder on a Spanish Cobra named Diego by convincing Rivera to go along with the untruthful story that Rivera and Laureano were walking down the street together and observed Diego shoot the victim. Laureano recalls Rivera being scared and ultimately fled to Puerto Rico before they could charge Diego with the murder. Years later, Laureano found out that the officers pinned the murder on Ramiro Alvarez ("Tiger") and Manuel Suastegui ("Gatto")<br><br>During Halvorsen's deposition, he was asked if he and Detective Guevara conspired to frame George Laureano for a murder even though Laureano had an alibi and was in custody at the time. Halvorsen pled the Fifth. Halvorsen also pled the Fifth when asked about framing Laureano for Junitos murder. He further pled the fifth when asked if Guevara told him that Laureano paid $20,000 to beat the case again Junito in front of Judge Reyna. |
| Efrain Cruz and Francisco Veras | Detectives Halvorsen, Guevara, Mingey and Sergeant Epplen conspired to frame two individuals for the murders of the Wiley brothers which occurred on May 25, 1990. Both witnesses were released after the officers realized they were in police custody on the day of the shooting. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Geraldo Iglesias | Iglesias was framed for the shooting death of Monica Roman on June 7, 1993 by Halvorsen and other police officers. Halvorsen fabricated evidence, falsified police reports, withheld exculpatory evidence and coerced witnesses as part of the homicide investigation. Halvorsen pled |

---

[1] Miedzianowski has been called "the most corrupt cop in the city's history." He is currently serving a life sentence in federal prison. Todd Lighty & Matt O'Connor, *Rogue cop gets life*, Chi. Trib., January 25, 2003 (available online at http://articles.chicagotribune.com/2003-01-25/ news/0301250139_1_joseph-miedzianowski-gang-members-badge) .

| | |
|---|---|
| | the fifth during his deposition when asked about these specific allegations. |
| Rosendo Ochoa | Ochoa was used by Halvorsen to frame Geraldo Iglesias for the shooting death of Monica Roman. Ochoa told Halvorsen he could not make an identification of the shooter in either a photo array on June 22, 1993 or live lineup on June 23, 1993. Halvorsen told Ochoa to pick out Iglesias even though Ochoa initially selected someone other than Iglesias from the line-up. Halvorsen improperly influenced Ochoa's decision to pick Iglesias out of both the line-up and photo array. Additionally, Halvorsen used threats and incentives related to Ochoa's own legal problems to coerce him into falsely identifying and testifying against Iglesias in June 1993. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Hugo Rodriguez | Rodriguez was an eyewitness to the shooting of Monica Roman. Halvorsen coerced Rodriguez into falsely identifying Geraldo Iglesias from a photo array and from a live line up on June 24, 1993. Even though Rodriguez could not make an identification of the shooter, Halvorsen threatened and coerced Rodriguez into identifying and testifying against Iglesias. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Michael Ybarra and Ivara Valasco | Halvorsen showed Edwin Davilla's photograph to Ybarra and Valasco to get them to identify Davilla for the murder of Jaime Alvarez. Halvorsen helped construct the lineup that Ybarra and Valsco viewed in July 1995 in an effort to frame Mr. Davilla for the Alvarez murder. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Edwin Davilla | Edwin Davilla was framed for the murder of Jaime Alvarez in June 1995. Guevara and Halvorsen had no probable cause to arrest Davilla. The detectives lied in their police report when they claimed two witnesses selected him from a photo array. The officers also forced Davilla to turn around during his lineup in order to expose his gang tattoo in an effort to influence the line-up. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| David Colon | Halvorsen pled the fifth when asked if he and Detective Guevara conspired to falsely charge David Colon with murder. He further testified that he falsified police reports and withheld documents from the State's Attorney and Mr. Colon's attorneys in an effort to frame David Colon for murder. |
| Efrain and Julio Sanchez | Both men gave sworn affidavits, swearing that they falsely identified David Colon as the shooter of Michael Velez as a result of threats and intimidation by Detectives Ernest Halvorsen and Reynaldo Guevara who were the lead detectives in the Velez investigation and the detectives who conducted the line-up in the Velez investigation. |

| | |
|---|---|
| | During Halvorsen's deposition, he pled the fifth when asked if he improperly influenced Efrain and Julio Sanchez to pick David Colon out of a line-up on September 8, 1992. |
| Manuel Rivera | Manuel Rivera was framed by Officer Halvorsen and other Chicago police officers for the murder of Marlon Wade in October 1989. During his deposition, Halvorsen pled the fifth when he was asked if he had any legitimate reason to suspect Rivera in the Wade murder. Halvorsen knew the IDs against Rivera were fabricated and had no reason to believe Rivera was the actual murderer. |
| Lorette Helean, Tran Brown and Virgilio Muniz | Officers Halvorsen, Guevara, Villardita and Gawrys improperly influenced Helean, Brown and Muniz to identify Manuel Rivera for the murder of Marlon Wade in October 1989 even though they knew Rivera was not the shooter. All three witnesses could not identify the shooter and Halvorsen knew their IDs were fabricated. While in Halvorsen's presence, Guevara told Muniz if he did not implicate Rivera in the Wade murder, Guevara would charge Muniz with the Wade murder. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Juan and Rosendo Hernandez | Juan and Rosendo Hernandez were framed for the murder of Jorge Gonzalez in June 1997 by Halvorsen and Guevara. The officers intentionally placed Rosendo and Juan in unduly suggestive lineups by having them be the only one in the lineup with booking numbers in their hands. |
| Jacqueline Montanez | On May 13, 1992, Halvorsen and Guevara coerced a false confession from Montanez, a 15-year-old juvenile, for the murders of Jimmy Cruz and Hector Reyes. In June 1995, the Appellate Court reversed and remanded for a new trial finding that "defendant was interrogated throughout the night as part of a pattern of police conduct designed to elicit a confession and that, during that interrogation, the police had prevented the efforts of defendant's mother to see the defendant until the confession was taken." Halvorsen pled the fifth when asked if he conspired to frame Montanez and coerced her to provide a false confession. |
| Daniel Rodriguez | Rodriguez averred that in March 1991, he falsely confessed to a murder under coercion from Officer Halvorsen and his partner Guevara. During his arrest, Halvorsen pushed him to the ground while pointing a gun at him stating, "you win!" "You got Junito's murder!" During Rodriguez's interrogation, Halvorsen struck him repeatedly and convinced him that if he just admitted he was the driver in the shooting, he would be able to go home. Halvorsen also prepared a typed written statement for Rodriguez in told him "this is what you are going to say." <br><br> During Halvorsen's deposition, he pled the fifth when asked if he and Detective Guevara conspired together to frame Daniel Rodriguez for the murder of Jose Hernandez ("Junito"). |

| | |
|---|---|
| Jed Stone re: Voytek Dembski | Dembski, a polish National who did not read or speak English, was interrogated by Halvorsen and Guevara without *Miranda* warnings, without notification to the Polish consulate, and without an interpreter. Dembski could not read the statement he eventually signed. Halvorsen and Guevara deliberately used Dembskis inability to speak English to obtain a false confession to the murder of Josef Skowron. |
| Luis Figueroa | Figueroa testified that in 1995, he viewed a line-up in connection with a murder investigation and falsely identified Angel Diaz as the shooter after being directed to do so by Detectives Halvorsen and Guevara. Figueroa recanted his identification at trial. |
| Angel Diaz | Angel Diaz was framed by Officers Halvorsen and Guevara for the murder of Yolanda Leal. The officers improperly influenced the witness Luis Figueroa into identifying Diaz as the offender. |
| David Velasquez | In May 1991, after sixteen-year-old David Velasquez told Detectives Halvorsen and Guevara he knew nothing about the murder of "Junito," The Detectives took Velasquez to a rival gang's territory and falsely alerted local gang members that Velasquez was responsible for the murder of Junito (a member of the local gang). After Velasquez begged Halvorsen and Guevara to put him back in the police car, they drove Velasquez to the station, where they chained him to a wall, beat him, and threatened him if he did not falsely implicate Daniel Rodriguez as "Junito's" shooter, Guevara would "pin" Velasquez with it. As a result of Det. Guevara's conduct, Velasquez implicated Rodriguez in a false statement |
| Timothy Rankins | Timothy Rankins provided a sworn testimony wherein he described the abuse he endured by Detectives Halvorsen, Guevara and Mingey when he was 19 years old. He said they put a phone book over his head and beat it with a flashlight, threw him out of his chair, and placed him in a chokehold to induce him to sign a pre-prepared statement implicating Serrano and Montanez. As a result, Rankins testified falsely before the Grand Jury but ultimately refused to testify at trial. Halvorsen pled the fifth when asked if he, Guevara and Mingey would either coerce or entice Mr. Rankins, whatever it took, to falsely implicate Montanez, Serrano and Pacheco in the Vargas murder. Halvorsen also took the fifth when asked if he told Rankins he could get his robbery dismissed if he implicated Serrano, Montanez and Pacheco. Halvorsen watched as Guevara beat Rankins over a twenty-four hour period and did nothing to stop him. |
| Jose Garcia | Jose Garcia filed a post-conviction petition alleging that he is actually innocent of the murder of Ajeandro Ocampo that occurred on July 13, 1995. He contends that during his interrogation, he did not knowingly or intelligently waive his *Miranda* rights and that any statements he made were a result of deception and material misrepresentations made by Officers Halvorsen and Guevara. Garcia asserts that Halvorsen hit him in his head and face and told him if he said something wrong, he'd be taken by to the interrogation room. At his trial, it was stipulated that |

| | |
|---|---|
| | Halvorsen lied to Garcia during his interrogation by telling Garcia that his alibi witness Alvarez had been interviewed and did not corroborate Garcia's alibi. He further argued that the officers abused and threatened key occurrence witnesses to inculpate Garcia. |
| Adriana Mejia and Rosauro Mejia | In 1998, while investigating the case in which Gabriel Solache and Arturo Reyes were framed, Halvorsen played good cop while Guevara brutally beat Rosauro Mejia and Adriana Mejia in order to obtain false confessions. Guevara repeatedly hit Rosauro Mejia in the presence of Halvorsen who did nothing to stop Guevara's unlawful conduct. Similarly, Guevara while in the presence of Halvorsen, pulled Adriana Mejia's hair and struck her on the back of the neck while interrogating her. Adriana also testified that Det. Guevara threatened her with life in prison. Rosauro never confessed and was finally released after being held in custody for three days. Both Gabriel Solache and Arturo DeLeon-Reyes have been exonerated. |
| Santos Flores | In 1995, Halvorsen and his partner Guevara coerced a confession from seventeen-year old Santos Flores after handcuffing him to a wall of a locked interview room and refusing his requests for an attorney. Flores eventually gave a statement indicating his involvement in the crime. The conviction was reversed on appeal because the "circuit court erred in denying defendant's motion to suppress the statement." In his deposition, Halvorsen pled the fifth when asked if he and Detective Guevara conspired to frame Santos Flores for a crime he did not commit. |
| Juan Hernandez | In August 1999, a citizen filed a complaint with OPS reporting that Det. Halvorsen "grabbed [the victim's head] and twisted it" and, according to an OPS investigator, "failed to provide for the safety and security of Juan Hernandez who was injured in his custody, and failed to seek medical treatment for him[.]"During this same incident, Det. Guevara had grabbed his face and arms, placed him into a headlock, and elbowed him while attempting to force him into a lineup.  An OPS investigator himself further reported that Det. Guevara had "failed to provide for the safety and security of Mr. Hernandez who was injured in his custody, and failed to seek medical treatment for him[.]" Also during this incident, Det. Wojcik struck the victim in the face five to ten times.  The detectives refused to allow the victim to speak to an attorney.  Following the incident, the victim—a federal prisoner taken from the Metropolitan Correctional Center to Area 5—was examined by a Federal Bureau of Prisons physician's assistant and was treated for "bruises to the face, body, right wrist and both arms, and a contusion to the inner elbow and scalp."  The victim reported to federal officials that "CPD officers physically abused him" and "roughed me … up."  Federal officials photographed the victim's injuries.  The victim was taken to the hospital for treatment where he reported being "hit by police officers." |

| State Representative William Delgado | In April 2001, State Representative William Delago filed a complaint with OPS contending that Officers Halvorsen and Guevara falsely testified at 17 homicide trials. Delgado told OPS that upon interviewing the defendants in those cases, they all stated that the detectives had told them "we're tired of busting you on petty crimes and we're gonna get you. We'll bust you for murder." |
|---|---|
| William Dorsch | Retired Area 5 Chicago Police Detective William Dorsch has testified under oath in numerous occasions about an incident in 1990 where he observed Guevara point to a photo signaling to a witness who to identify from the photo array. Additionally, at Plaintiff's post-conviction hearing, Dorsch testified that Halvorsen falsely claimed in the unrelated murder investigation of William Stewart that Dorsch had provided him with a tip that led to the arrest of Fabian Santiago. Dorsch testified that he was never involved in the investigation and provided no such tip to Halvorsen. The "tip" was fabricated. Santiago was later exonerated in 2022. |

116.    Neither Defendants Halvorsen nor Guevara ever received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

117.    In fact, the City of Chicago failed to supervise or discipline its police officers including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**Plaintiff's Damages**

118.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff served over 23 years in prison for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

119.    Over the course of his 23 years' of imprisonment, Plaintiff was separated from his children and lost the chance to raise, care for, and mentor his children who were adults by the time Plaintiff was released from prison.

120.    As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**COUNT I**
**42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence**

121.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

122.    As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendments by fabricating Ciro Mendoza''s false identification of Plaintiff as the person who beat Jose Mendoza to death.

123.    In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Ciro Mendoza implicating Plaintiff in the crimes that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

124.    The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

125. Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Jose Mendoza. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

126. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

127. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

128. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
### 42 U.S.C. § 1983 – *Brady* Violations

129. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

130. As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

131. All of the Defendant Officers concealed exculpatory evidence that: (1) Defendant Guevara fabricated an "anonymous tip" for the purpose of justifying placing Plaintiff in a line-up

33

where he could induce a false identification of the Plaintiff; (2) Plaintiff had provided a consistent alibi to the crime; (3) the occupants of the car freely confessed that they could not identify the perpetrator(s) as it was dark, chaotic, and they were highly intoxicated; and (4) Ronaldo Alvarez was threatened with deportation if he did not falsely implicate Plaintiff and fled the state so as not to have to falsely implicate an innocent man.

132. The Defendant officers hid police reports memorializing this exculpatory evidence in different files and purposefully ensured that the reports were not including in the investigative file or forwarded to prosecutors so that Plaintiff and his defense counsel would not discover the exculpatory evidence.

133. The Defendants further suppressed their own misconduct and the misconduct of their fellow officers.

134. The Police Officer Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 23 years in prison for a crime he did not commit.

135. The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

136. As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

137.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**

138.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

139.    In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

140.    The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

141.    In so doing, the Defendant officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

142.    The Defendant officers subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' fabrication of evidence, and suppression, and withholding of evidence.

143. The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

144. As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

145. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
## 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

146. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

147. All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

148. All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

149.     In this manner, the Police Officer Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

150.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

151.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

152.     As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

153.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V**
**42 U.S.C. § 1983 – Failure to Intervene**

154.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

155.     In the manner described above, one or more of the individual Police Officer Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

156.     These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

157.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

158.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

159.    The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI
### 42 U.S.C. § 1983 – *Monell* Policy and Practice Claim

160.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

161.    The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1985, no fewer than 75 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

162.    The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) concealment of exculpatory evidence; (2) manipulation of witnesses in order to obtain false identifications; and (3) manipulation of witnesses in order to influence their testimony; and (4) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

38

163.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

164.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Defendants coerced, manipulated, and procured false identification testimony from the only witness to the crime, Ciro Mendoza.

165.    At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

166.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, manipulated, tricked, and improperly influenced the testimony of Ciro Mendoza to falsely implicate Plaintiff.

167. The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

168. Prior to and during 1993, the year in which Plaintiff was falsely charged with the murder of Jose Mendoza, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Officer of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

169. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

170. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of

these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

171.    The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulation/coercion of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are over 50 known cases in which Guevara and Halvorsen engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as they did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

172.    The City of Chicago and its Police Department failed in 1985 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.      The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.      The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

d.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.   The risks of engaging in tunnel vision during investigation.

f.   The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

173.   The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

174.   The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Defendants Guevara and Halvorsen effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

175.   The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

176.   The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

177.   The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more

interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

    a.    manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

    b.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

    c.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants Guevara and Halvorsen.

    d.    perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or

otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

178.    The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

179.    As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

180.    The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

## COUNT VII
## State Law Claim – Indemnification

204.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

205.    Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

206.    The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Nelson Gonzalez prays this Court enter judgment in his favor and against Defendants Reynaldo GUEVARA, William JOHNSTON, Eugene VANN, Roland PAULNITSKY, Geri Lynn YANOW as special representative of Ernest HALVORSEN, and the CITY OF CHICAGO awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands trial by jury.

Respectfully Submitted,

**NELSON GONZALEZ**

By:     /s/JENNIFER BONJEAN
        *One of His Attorneys*

BONJEAN LAW GROUP, PLLC
Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY 10022
718-875-1850

**<u>Chicago Address</u>**
53 W. Jackson Blvd., Ste. 315
Chicago, Illinois 60604